**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **CHERYL A. VALADEZ** | : | **CIVIL ACTION NO.** |
| **Plaintiff** | : | **3:08-cv-00065 (AWT)** |
| | : | |
| **V.** | : | **TRIAL BY JURY** |
| | : | |
| **TOWN OF ROCKY HILL, ET AL** | : | **MARCH 25, 2010** |
| **Defendants** | : | |

## MEMORANDUM OF LAW IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Plaintiff, Cheryl Valadez, respectfully submits the following Memorandum of Law in support of opposition to Defendants' Motion for Summary Judgment by Defendants Jeffrey Harris, Edward Peruta and Lois Peruta as to all claims against them.

Because the Plaintiff has presented sufficient evidence to establish that genuine issues of material fact exist as to all claims in the complaint, and the Defendants are not entitled to judgment in their favor without findings of fact at trial, the Defendants' motion for summary judgment should be dismissed.

### I.    PRELIMINARY STATEMENT

Cheryl Valadez and Jeffrey Harris were in a long-term relationship for approximately 10 years, beginning in 1997 and ending in 2007. While Valadez and Harris were involved in a romantic relationship they lived together at a condominium owned by

--

1

Jeffrey Harris at 29A Carillon Drive in Rocky Hill, Connecticut. Valadez helped Harris operate his business, Harris Agricultural Enterprises, Inc. without wage or salary during the years that she resided at the condominium.

Although Jeffrey Harris was at times abusive toward Valadez, she left the condominium on only one occasion in October 2005. Prior to leaving the condominium, she signed a contract agreeing to leave the condominium in exchange for a payment by Jeffrey Harris of ten thousand dollars ($10,000.00) in settlement of past debts. She left the condominium pursuant to the agreement and moved to Florida. Less than two months later, Harris traveled to Florida and asked Valadez to return to Connecticut and move back into the condominium. Valadez decided to move back at his insistence.

On October 28, 2007, Jeffrey Harris was involved in an argument with Valadez and left the condominium. He was injured the following night in a fire at a barn owned by Harris Agricultural Enterprises and treated for burns at Bridgeport Hospital. Edward Peruta, a friend of Harris and an employee and corporate secretary at Harris Agricultural Enterprises, Inc., visited Harris at the hospital on October 30. During this visit, Harris instructed Peruta to tell Valadez to leave and to help her pack her belongings.

--

Following his visit to Harris, Edward Peruta went to the Rocky Hill Police Department and told them that Valadez was trespassing at the condominium and that he intended to throw her out of the condominium. He was accompanied to 29A Carillon Drive by Officers Tyler and Burns. After arriving at the condominium, Peruta shouted up to Valadez's window, telling her that there were two men downstairs that wanted to speak to her. Valadez exited the condominium from a rear door and came around to the front door, where Peruta had already forced the door open. Peruta shouted in the presence of the officers that Valadez was a "squatter" and that he wanted her out in one hour. Officer Burns told Peruta that one hour was not enough time for Valadez to pack up essential belongings and arrange for another place to stay, and Peruta then stated that Valadez had to be out of the condominium when he returned the next morning, October 31, at 8 a.m.

Valadez attempted to block Peruta's entry into her residence, but she was held back by the officers. Terrified of the police and Peruta, Valadez fled into the nearby woods and stayed there overnight. The temperature outside that night plunged to 37 degrees Fahrenheit. After Valadez left, Peruta and the officers entered the condominium and Peruta took pictures of the interior.

--

3

The following morning, October 31, 2007, at about 8 a.m. Edward Peruta, his wife, Lois Peruta, several employees of Harris Agricultural Enterprises, Inc. under the direction of Peruta, and several officers of the Rocky Hill Police Department arrived at the condominium with trash bags. Once in the condominium, the Perutas and the men they brought along began throwing Cheryl Valadez's personal property into trash bags. Sharon Hartstein, who lives next door to 29A Carillon Drive, witnessed the men take large items belonging to Valadez to a nearby dumpster. After spending a while ransacking Valadez's belongings, Peruta was informed by the Rocky Hill police that they received a call from a housing court and that he was not legally authorized to bag Valadez's belongings. The police threatened to arrest Peruta if he continued.

Peruta and the others stopped and left the condominium. Valadez returned to the condo after Peruta, his wife and the police left. She found a bag containing some of her clothing which had been ruined by a bottle of bleach also thrown in the bag. She was advised by her attorney, Edward Noble, that she was allowed to stay at the condominium, but Edward Peruta paid several unannounced visits to the condominium to harass Valadez. She left the condominium to live with her daughter Shatina in Wethersfield.

--

When she attempted to come back to the condominium to retrieve her belongings, she was told she could not come. It is unclear how Jeffrey Harris, Edward Peruta and Lois Peruta disposed of Cheryl Valadez's belongings, but she has been deprived of their possession or use.

The litigation and events following the interaction between Valadez, Harris and Edward Peruta have been complicated and ugly. Edward Peruta has created a series of webpages on his website, ourrockyhill.com, in which he launches into tirades about Valadez's residence at the condominium, Edward Peruta's frustrated effort to throw her on the street, and ongoing criminal cases involving a dispute between Valadez and Peruta over a truck belonging to Harris Agricultural Enterprises. On those web pages, Peruta accuses Valadez of extortion, criminal trespassing, harassment, and other criminal behavior, and posts numerous personal and private details about Valadez's residences, job history, automobile registration, and health problems. He filed a lawsuit on his behalf and on behalf of Harris Agricultural Enterprises against Valadez and her attorney, Edward Noble, which was dismissed.

Far from Peruta's portrayal of himself as merely acting out of concern for his friend Jeffrey Harris, Peruta has launched a personal vendetta to discredit, embarrass, humiliate, harass and ruin Ms. Valadez. As a result of his extreme and outrageous

--

5

actions, the actions of his wife Lois, and the directions of Jeffrey Harris, Cheryl Valadez was dispossessed of her home of 10 years, lost the use and possession of most of her personal property, she has suffered severe emotional distress which exacerbated her generalized anxiety disorder and post-traumatic stress disorder, and has fled her long-time residence in the state of Connecticut due to this extensive campaign of character assassination and humiliation. She now resides in Florida.

## II.     STANDARD OF REVIEW

Summary judgment should only be granted where "there is no genuine issue of material fact to be tried, and the moving party is therefore entitled to judgment as a matter of law." *Root v. Liston*, 44 F.3d 127, 130 (2d Cir. 2006); See Fed. R. Civ. P. 56©. The burden is on the moving party to establish the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006). "Material facts" are facts that "might affect the outcome of the suit under the governing law," and the existence of such facts precludes summary judgment. *Konikoff v. Prudential Insurance Co. of America*, 234 F.3d 92, 97 (2d Cir. 2000). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

--

6

"The court's role on a motion for summary judgment is not to decide disputed issues of fact but to determine whether there is a genuine issue of fact to be tried." *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir. 1991). It is up to the trier of fact at trial to make credibility determinations, weigh the evidence, and draw legitimate inferences from the facts, and the court should deny summary judgment where the nonmoving party presents evidence from which a reasonable jury could return a favorable verdict. See, e.g., *Golden Pac. Bancorp v. FDIC*, 375 F.3d 196 (2d Cir. 2004). "[S]ummary judgment is perforce improper where conflicting evidence is adduced." *Patrick v. Le Fevre*, 745 F.2d 153, 160 (2d Cir. 1984).

In determining whether a case presents triable issues of fact, the court "must resolve all ambiguities and draw all reasonable inferences against the moving party." *Artis v. Liotard*, 934 F.Supp. 101, 103 (S.D.N.Y. 1996) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). At the summary judgment phase of litigation, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *Anderson*, 477 U.S. at 255. Summary judgment is inappropriate even in cases where questions of material fact are doubtful. *Velardi v. Walsh*, 40 F.3d 569, 574 (2d Cir. 1994); *Golino v. New Haven*, 950 F.2d 864, 871-72 (2d Cir. 1991).

III.     **LAW AND ARGUMENT**

--

7

**A**      **The Plaintiff Has Alleged Facts Sufficient to Raise Genuine Issues of Material Fact Regarding Her Battery Claim.**

In Connecticut, a battery is defined as an intentional, unprivileged, offensive bodily contact. *State v. Timney*, 204 A.2d 417 (Conn. Cir. 1964); RESTATEMENT (SECOND) OF TORTS § 13. To show the requisite element of intent, a plaintiff must show that the defendant acted willfully and voluntarily; under circumstances show a reckless disregard for the consequences; or negligently. *Alteiri v. Colasso*, 362 A.2d 798 (Conn. 1975). Further, as pointed out by the Defendants, a person may be liable for harm to the plaintiff caused by the tortious conduct of another if he knows the other's conduct is a breach of duty and gives substantial assistance or encouragement to the other to commit the tortious conduct. *Calore v. Town of Stratford*, 2001 WL 58364 at 4 (Conn. Super., Jan. 8, 2001) (citing 4 RESTATEMENT (SECOND) OF TORTS § 876).

It is undisputed that Edward Peruta, Lois Peruta, and Jeffrey Harris did not touch Cheryl Valadez's person during the night of October 30 or the morning of October 31, or at any time relevant to the present action. However, Plaintiff contends that on the night of October 30, Edward Peruta intended to have Cheryl Valadez removed from her residence at 29A Carillon Drive immediately, with the threat of physical force by the. He approached members of the Rocky Hill Police Department with a signed document

--

8

labeled "Power of Attorney," and copies of several statutes and an opinion by the Connecticut Office of Legal Research that he represented as giving him an unfettered right to have Ms. Valadez removed from her residence without notice or summary process, and with the police's assistance if necessary. **(Facts on Harris Incidents (Exhibit 3) at p. 14)**. The Rocky Hill Police Department proceeded with Edward Peruta to Ms. Valadez's residence on that basis.

Once he arrived at 29A Carillon Drive, Edward Peruta's first act was to shout up to Cheryl Valadez, who was inside the condominium, telling her that she should come down and that there were a couple of men who would "like to talk to her." **(Valadez Deposition (Exhibit 1) at pp. 54-55, 137).** Cheryl Valadez came around to the front of the condominium, where Edward Peruta informed police that she was a "squatter," and demanding that she be out of the condominium within one hour. **(Valadez Deposition at p. 54).** When Peruta made this outrageous accusation against Ms. Valadez, Ms. Valadez became upset and attempted to stop Edward Peruta from barging into her residence. **(Valadez Deposition at p. 56).** The two officers of the Rocky Hill Police Department present that night, George Burns and Clyde Tyler, then restrained Ms. Valadez while allowing Peruta to enter through the front door. **(Valadez Deposition pp.59-61).**

--

The Defendants state that Edward Peruta's purpose in bringing police officers with him to Cheryl Valadez's home was to maintain the peace. In fact, Edward Peruta has stated that he brought the police with him in order to gain entry to the condominium and have Valadez evicted. ("I … proceeded to the Rocky Hill Police Department to seek their assistance in having Ms. Cheryl Valadez removed from the primary residence of Mr. Jeffrey B. Harris." **Facts on Harris Incidents at p. 13**). Cheryl Valadez is of relatively small stature, one of her arms was damaged and visibly deformed as a result of a childhood accident, and at the time of the eviction she was being treated for liver cancer. **(Valadez Deposition at pp. 60 – 61, 103)**. It is unlikely that Edward Peruta reasonably believed that he needed police protection from Valadez. In addition, if it was Edward Peruta's objective to avoid a confrontation with Ms. Valadez and a breach of the peace, shouting in the evening that Valadez should come down because there were two men (in fact, two police officers) who wished to speak to her and yelling that Valadez was a squatter and that he wanted her to quit the premises within an hour was a strange means to achieve that objective.

In addition, Ms. Valadez was given no warning before October 30 that Edward Peruta planned to pay a visit to the condominium, or that he would be bringing police officers, or that he was going to demand that she leave. **(Valadez Affidavit (Exhibit 7)**

--

10

**at p. 16)**. Instead, Valadez discovered on the evening of October 30 that Edward Peruta planned to give her one hour to leave her home of ten years, and had brought the police to make sure she did. **(Valadez Affidavit at ¶ 29)**. Officer Burns states in his affidavit that after Peruta gave her a one-hour time limit to leave, he told Peruta that one hour was not enough time.  **(Burns Affidavit (Exhibit 11) at ¶13**). Peruta then told her to leave before 8 a.m. the following morning.

On Peruta's website, ourrockyhill.com, Edward Peruta posted a document labeled as his power of attorney, but which is actually a note which states that there was a woman who lived at 29A Carillon Drive, who was not the owner, who had signed an agreement to leave, and whom would be prosecuted for violating Connecticut criminal trespass law with the help of law enforcement if she returned. **(29A Carillon Drive web page (Exhibit 9) at p. 8).**

In light of this evidence, a rational finder of fact could conclude that Edward Peruta approached the police with documentation with the intent to have Cheryl Valadez removed from the condominium that evening, by force or by threat of arrest; that Edward Peruta arrived at 29A Carillon Drive intent on provoking Cheryl Valadez to come down to the front door and get into an argument with him; and that Edward Peruta knew or should have known, or at least created an unreasonable risk that the presence

--

of two police officers and his provocation of Valadez by calling her down to talk to the officers and accusing her of squatting was likely to cause the police to apprehend or use physical force or the threat of imminent physical force against Valadez.

Defendants state that there is no dispute of the fact that the police officers were not under the command of Peruta. Whether the police officers were under Peruta's command is not only a legal conclusion but is immaterial to Valadez's claim for battery. Instead, the appropriate legal standard is whether Edward Peruta knew that the police officers' conduct constituted a breach of duty and whether he gave the officers substantial assistance or encouragement to the other so to conduct themselves. *See Calore*, 2001 WL 58364 at 4.

Edward Peruta is no stranger to conflict with the police; on his site, ourrockyhill.com, Edward Peruta has undertaken to make himself an expert on law in general and civil rights and police misconduct in particular. His site contains details on various interactions the Rocky Hill Police have had with him and his legal theories as to why the police officers' actions represent violations of his civil rights.  **(Facts on Harris Incidents at pp. 1-9).** As discussed in further detail below in response to Defendants' claim that they are entitled to summary judgment on Plaintiff's trespass claims, Plaintiff had rightfully resided at the condominium, and Edward Peruta knew or should have

--

12

known that the Plaintiff had a right to summary process before eviction, or that there was at least a question as to her legal rights. Even if the Plaintiff did not have the rights of a tenant, roomer or boarder at the condominium, it was unreasonable for Peruta to bring police officers to throw out a person whom he characterizes as a "guest" on his website and then to declare to those police officers that she was a squatter on the property, without first speaking with her and asking her politely to leave. The evidence strongly suggests that Peruta knew the police had no privilege to throw a tenant in peaceful possession out of her home on the mere word of the owner or his agent.

The Plaintiff, Cheryl Valadez, has presented evidence sufficient to allow a finder of fact to infer that Edward Peruta knew or should have known that the police would breach their duty by using force to effect an eviction of a woman from her residence, and that he gave assistance and encouragement to the officers to grab and detain Valadez by engineering an unnecessary confrontation between Valadez and Peruta in front of police officers; in short, that Edward Peruta intended, or was negligent in creating an unreasonable risk that the police would grab and detain Cheryl Valadez so that he could avoid having to touch the Plaintiff himself. To allow Edward Peruta to avoid liability of battery by saying that the police, not Peruta, actually touched Valadez would allow Peruta to lay a trap for Valadez with impunity and accomplish the desired

--

13

use of force and detention of Valadez. At the very least, Peruta was negligent as to whether his actions would create a situation where the police would use force on the Plaintiff. For these reasons, the court should deny summary judgment as to the Plaintiff's claim for assault and battery.

The Defendants have argued that the Plaintiff has no claim because she did not file an action for forcible entry and detainer under Section 47a-43 of the Connecticut General Statutes, and that the fact that Plaintiff never filed a forcible entry and detainer action proves that the Plaintiff's claims are groundless. The purpose of the forcible entry and detainer statute is to make unlawful the forcible dispossession of a person in peaceful possession of a property (even if that person is a trespasser). *Fleming v. City of Bridgeport*, 886 A.2d 1220 (Conn. App. 2005). It is in its nature "an action by which one in the possession and enjoyment of any land, tenement or dwelling unit, who has been deprived of it, may be restored to possession and enjoyment." *Id.*

Defendants appear to suggest that forcible entry and detainer is the exclusive remedy for wrongful eviction or assault and battery incident to that eviction, but they offer no authority to support this argument. In fact, forcible entry and detainer is often invoked contemporaneously with trespass actions. See, e.g. *Orentlicherman v. Matarese*, 121 A. 275 (Conn. 1923).

--

14

Further, Defendants' statement that "Valadez' [sic] failure to pursue the remedy specifically intended for her damages reasonably implies that Valadez knew she would not have prevailed at a hearing intended to remedy the damages she now claims in this federal lawsuit," is unsupported by any legal authority. Forcible entry and detainer is a remedy with a limited limitations period, intended primarily to restore a person dispossessed of real and personal property by means of force with an expedited means to be restored to possession. *Fleming*, 886 A.2d 1220.  The prerogative to pursue some causes of actions but not others belongs to the Plaintiff, and one cannot say that a plaintiff's forbearance of certain legal remedies implies a waiver of all other related causes of action or tends to prove that other related causes of action are without merit. One of two inconsistent pleadings cannot be used as evidence that there is no cause of action in the other pleading. *Suege v. Mercedes-Benz Credit Corp.*, 329 F.Supp.2d 285 (D.Conn. 2004). Allowing a jury or other finder of fact to speculate about an alternative pleading in another case is prejudicial and outweighs the probative value of such evidence. *Id.* (citing F.R.E. 403). If a jury or court should not be allowed to consider alternate theories of liability in collateral cases, then it should not be allowed to consider the implication of the plaintiff's decision not to allege particular causes of action.

--

15

Because the Defendants raise the issue of forcible entry and detainer, however, they raise an interesting, related point. Forcible entry and detainer provides a legal remedy to obviate the need for the owner of a property to employ the use of force to regain possession of that property from a person in peaceful possession. *Fleming*, supra. Rather than giving any advance notice to Cheryl Valadez to leave the property before appearing at the condominium with police, or proceeding with summary process, or invoking the same forcible entry and detainer statute which the Defendants seek to pin on the Plaintiff, Edward Peruta decided to move immediately to bring the aid of armed police officers to have Valadez removed within an hour. He brought into the dispute of Valadez's peaceful residence at 29A Carillon Drive the very real possibility of a confrontation, a breach of the peace, and the use of force that the forcible entry and detainer statute seeks to discourage.

**B.    The Plaintiff Has Submitted Evidence Sufficient to Raise Genuine Issues of Material Fact Regarding Her False Imprisonment Claim.**

Because the Plaintiff has offered sufficient evidence to raise a genuine issues of material fact as to whether Edward Peruta intended to use the police as an instrument to harass, intimidate and coerce the Plaintiff through physical force to leave her residence without summary process, she also has raised genuine issues of material fact

--

16

as to whether Peruta intended to use and in fact used the police to falsely imprison the Plaintiff.

False imprisonment is defined as the unlawful restraint by one person of another's physical liberty. *LoSacco v. Young*, 20 Conn. App. 6 (1989). False imprisonment is any act directly or indirectly confining another, for any amount of time, where the act is designed to confine the other, the other is conscious of the confinement, and the confinement is not consensual or privileged. *Nisa v. Dairy Mart*, 1993 WL 103031 at 4 (Conn. Super. March 29, 1993).

It is undisputed that Officers Burns and Tyler restrained the Plaintiff. They grabbed her by the arms. This act was designed to confine her so that she could not move. She was fully alert and aware of the fact that she was restrained by the officers. The only issues in dispute are whether an act of Edward Peruta caused the confinement, whether Peruta intended that Valadez be confined, and whether the confinement was privileged.

Edward Peruta committed several acts that, together, resulted in the Plaintiff's confinement. He approached the Rocky Hill Police Department with paperwork in hand and made statements calculated to make the police believe that Cheryl Valadez was a criminal trespasser at the condominium. His note, which he posted on his website

--

17

ourrockyhill.com, states that if Valadez returned to the property, he intended to bring the police to enforce criminal trespass laws. **(29a Carillon Drive page at p.8).** He brought the police to the condominium at 29A Carillon Drive and made a point to tell Valadez to come downstairs because two people wanted to speak to her, even though Defendants state that the purpose of bring the officers to the condominium was to maintain the peace, not effect an arrest.  **(Valadez Deposition at pp. 54-55, 137).** Once Valadez came to the front of the condominium, Peruta accused Valadez of being a squatter and barged into the front door of the condominium.  **(Valadez Deposition at p. 54).**

One would expect a person to try to barricade an intruder from her home. On top of this, Edward Peruta brought police to the condominium without any previous indication that Valadez would become violent. The evidence implies that Edward Peruta had no reason to fear for his safety. Edward Peruta brought the police to the condominium and arranged for her to come outside in the hopes that police officers would arrest her on Peruta's word that she was a criminal trespasser. Although Peruta was frustrated in his goal to have Valadez arrested and taken away in handcuffs, the police did restrain Valadez at least temporarily. If the police had known that Valadez was not squatting at the condominium, that Jeffrey Harris had welcomed her back to the condominium in late 2005 after she honored her promise to move out, and that Edward

--

18

Peruta had not made any attempt to ask her to vacate the premises peacefully, they would have been less likely to hold her back and allow an unjustified intrusion and eviction of her from the premises. The Plaintiff has offered sufficient evidence to raise genuine issues of material fact as to Edward Peruta's intent to restrain Ms. Valadez and the acts of Peruta that caused her to be restrained.

As discussed above, neither Edward Peruta nor the police had a privilege to detain the Plaintiff. Even if the police had mistakenly believed that Cheryl Valadez was a trespasser at the condominium property based on Peruta's representations, such a belief was unreasonable because the police made no attempt to interview Valadez and make a determination that she had no right to occupy the condominium; all the police had was the word of Ed Peruta. For these reasons, the court should deny Defendants' motion for summary judgment as to the Plaintiff's claim for false imprisonment.

--

**C.    Plaintiff Has Offered Evidence Sufficient to Raise Genuine Issues of Material Fact as to Her Claims for Trespass to Land and Trespass to Chattels.**

Before discussing the evidence which raises issues of fact and necessitates denial of Defendants' motion for summary judgment, it should be noted that Defendants completely misstate the standard of review for a motion for summary judgment. Summary judgment should only be granted where "there is no genuine issue of material fact to be tried, and the moving party is therefore entitled to judgment as a matter of law." *Root v. Liston*, 44 F.3d 127, 130 (2d Cir. 2006); See Fed. R. Civ. P. 56©. At the summary judgment phase of litigation, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *Anderson*, 477 U.S. at 255. Summary judgment is inappropriate even in cases where questions of material fact are doubtful. *Velardi v. Walsh*, 40 F.3d 569, 574 (2d Cir. 1994); *Golino v. New Haven*, 950 F.2d 864, 871-72 (2d Cir. 1991).

The Defendants have filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. This is not the final determination of the factual issues of the case after both sides have presented competent evidence at trial. Yet the Defendants have stated in Section D of their memorandum of law in support of their motion for summary judgment that their motion should be granted because the Plaintiff

--

20

"cannot carry her burden of proof." See Defendants' Memorandum of Law in Support of Motion for Summary Judgment, p.16.  Defendants' seek to have the court inappropriately determine the credibility of witnesses and weigh the evidence before the action ever goes to trial before a jury. As discussed below, the Plaintiff has offered evidence sufficient to raise triable issues of fact regarding her claims for trespass to land and trespass to chattels, and that is all that is required to defeat a motion for summary judgment.

In Connecticut, an action for trespass to land lies when a defendant intentionally invades, intrudes or enters land affecting the plaintiff's exclusive possessory interest in the land, causing direct injury. *Boyne v. Glastonbury*, 110 Conn. App. 591 (2008). Defendants argue that Valadez has no exclusive possessory interest – that she was a trespasser or squatter at the condominium or at most a guest – and therefore cannot maintain an action for trespass to land. However, the plaintiff has an exclusive possessory interest – that is, the right to exclude others who do not have a possessory interest – in the property by virtue of her long cohabitation with and contribution of services to Jeffrey Harris at the condominium under an implied contract or quasi-contractual rights.

--

21

Connecticut recognizes and enforces express and implied contracts and quasi-contractual obligations between cohabitants, even though it does not afford cohabitants rights to equitable distribution or alimony on the basis of common-law marriage. *Boland v. Catalano*, 521 A.2d 142 (Conn. 1987).  In *Boland*, the defendant, who cohabitated with the plaintiff at his home, sued her former partner for property held in the plaintiff's name. The plaintiff was the sole owner of the home in which the couple cohabitated, and the parties had no express lease agreement or express contract giving the defendant a property interest in the home. However, the defendant contributed money and services for the improvement of the plaintiff's property and provided household services, and the parties shared access to each other's bank accounts and other property nominally in their individual names. On this basis, the Connecticut Supreme Court determined that a finder of fact could find that an implied contract existed between the parties which entitled the woman to some of the property owned and acquired in her cohabitant's name during the course of their relationship.

Defendants correctly state that Connecticut law does not recognize common-law marriage, and that Cheryl Valadez asserted that she was Jeffrey Harris's common-law wife on October 30, 2007 in response to Edward Peruta's efforts to gain entry to the condominium. Regardless of Cheryl Valadez's misunderstanding of Connecticut family

--

22

law at the time of the intrusion, she had a right to the property and could exclude trespassers from her residence. Cheryl Valadez's residence at 29A Carillon Drive was not an ephemeral one; she resided at the condominium with its legal owner, Jeffrey Harris, for almost the entirety of ten years.

While residing with Harris, Valadez contributed services to Harris's household and to the business he owned, without any compensation or enrichment. Valadez and Harris shared numerous services and property, including a bank account, cable service, telephone service and utilities. **(Valadez Affidavit at ¶ 7).** Defendants note that Valadez and Harris executed an agreement to leave the property in return for a payment of $10,000.00; the agreement states by its terms that the agreement to "compensate Cheryl Valadez is payment in full **of all issues between us**." (emphasis added). On several occasions, Valadez loaned money to Harris to purchase a truck at auction and pay other expenses for his business. **(Valadez Deposition at pp. 28-30).** The agreement, signed on October 31, 2005, two years before the events that are the subject of the law suit, was not merely a gift to Valadez but an acknowledgment that Valadez had a right to reside at the condominium as a consequence of an agreement between the two, and that Valadez could forego that right as consideration for a large sum of money; and that the parties recognized that Harris owed Valadez for numerous

--

23

debts between them. It should also be noted that Harris or Peruta did not, at that time, resort to lockout or the help of Rocky Hill Police in removing Valadez from the residence – they acknowledged that she had a right to the property and was entitled to compensation to waive that right.

Regardless of the agreement, which Valadez honored by leaving the condominium, Jeffrey Harris had a change of heart and traveled to Florida to persuade Valadez to move back to Connecticut with him. **(Valadez Deposition at pp. 27-30).** Valadez moved back to Connecticut with Harris at the end of 2005 after he enticed her to return to him. The course of the previous agreement to vacate had been completed and all promises had been performed. Valadez's residence at the condominium was outside the scope of the 2005 written agreement to vacate and the agreement is therefore irrelevant.

Valadez returned to the condominium in reliance on Harris's promise that the relationship would return to its status before she signed the agreement and moved out. She continued to share responsibilities for the household and help Harris run his business, just as she had before she moved out. She was not a "guest" in Harris's home, there only at his pleasure and license; she was cohabiting under an implied agreement that she had a right to stay at the property in return for her contributions to

--

24

the living arrangement. In light of the long relationship and continuous cohabitation between Harris and Valadez, the previous agreement compensating Valadez to leave the premises, and Harris's request that Valadez return to Connecticut and his condominium, and the shared bank account and services, a jury could find that an implied contract or quasi-contractual right existed which gave Valadez a right to exclude others from the condominium.

Defendants also claim that it is undisputed that Edward Peruta had a valid Power of Attorney from Jeffrey Harris that gave Peruta and Lois Peruta as a subagent the same rights to enter the property as Jeffrey Harris held. The Plaintiff disputes the validity of the Power of Attorney, and even if the Power of Attorney is a valid document, it did not give the Peruta's a right to enter the condominium and ransack the Plaintiff's belongings for unlawful purposes.

A durable power of attorney, in order to be valid, must comply with the requirements of C.G.S. § 45a-562. That statute states in pertinent part: "(a) The subsequent disability or incompetence of a principal shall not revoke or terminate the authority of any person who acts under a power of attorney in a writing executed by the principal, if the writing contains the words "this power of attorney shall not be affected by the subsequent disability or incompetence of the principal," or words of similar import

--

25

showing the intent of the principal that the authority conferred shall be exercisable notwithstanding the principal's subsequent disability or incompetence; provided the power of attorney is executed and witnessed in the same manner as provided for deeds in section 47-5." C.G.S. § 47-5 states:

All conveyances of land shall be: (1) In writing; (2) if the grantor is a natural person, subscribed, with or without a seal, by the grantor with his own hand or with his mark with his name annexed to it or by his attorney authorized for that purpose by a power executed, acknowledged and witnessed in the manner provided for conveyances or, if the grantor is a corporation, limited liability company or partnership, subscribed by a duly authorized person; (3) **acknowledged by the grantor, his attorney or such duly authorized person to be his free act and deed**; and (4) attested to by two witnesses with their own hands.

In other words, a durable power of attorney must be acknowledged (that is, notarized) in order to be valid. The Power of Attorney is "acknowledged" by a person named "Rhonda M. Way," who is listed only as "person taking acknowledgment." **(Power of Attorney (Exhibit 2)).** C.G.S. § 47-5a lists the classes of people before whom acknowledgment may be made, including notary publics and certain state officers.

--

26

The "acknowledgment" by Rhonda M. Way does not state whether she is a notary public or other officer authorized to take such acknowledgments, but if she is a notary public, her acknowledgment must, at the very least, indicate under her signature that she is a notary. See C.G.S. § 3-94k.  Also, the acknowledgment must bear a certificate as required by C.G.S. § 1-34. Because the document purporting to be a power of attorney is not properly acknowledged according to the required legal form, it is not a valid document. Therefore, Edward Peruta's claim of agency and the general power to enter and possess the condominium in the same capacity as Jeffrey Harris, predicated upon the so-called Power of Attorney, must fail as a matter of law.

Even though Jeffrey Harris would have had the general right to enter 29A Carillon Drive himself, and to grant Peruta a license to enter the property, Edward Peruta, Lois Peruta, and the employees Edward Peruta brought with him to help evict the Plaintiff and bag and destroy the Plaintiff's belongings lacked the authority to act on Harris's behalf to do so. They were not on the property in the same capacity as Jeffrey Harris, and because they did not have equal rights to the property, Cheryl Valadez had the right to exclude them. Even if a person has ownership rights to a dwelling unit, as a landlord, that person or his agents may not enter a dwelling unit for certain unlawful purposes. For instance, "a landlord shall not abuse the right of entry or use such right of

--

27

entry to harass the tenant… shall give the tenant reasonable written or oral notice of his intent to enter and may enter only at reasonable times, except in case of emergency." C.G.S. § 47a-16.

Edward Peruta was notified by member of the Rocky Hill Police Department on October 31, 2007 that they received a call from a housing court notifying them that the eviction was illegal, and instructed him that if he continued to evict Valadez without going through the necessary process, he would be arrested. **(Peruta v. Rocky Hill 56(a)(2) statement (Exhibit 12) at ¶ 18 – 19).** Despite this warning, Peruta continued to come by the condominium unannounced while Valadez was home. **(Valadez Affidavit at ¶ 47).**

Although not alleged as an independent cause of action, Edward Peruta's actions and the circumstances surrounding his efforts to remove Valadez from her residence amount to a constructive eviction. Although Peruta's goal was to actually evict the Plaintiff, and he had an erroneous belief that he was entitled to do so without process, her ultimate quitting of the property was, in fact, a constructive eviction.

A constructive eviction exists when a landlord does something or omits to correct some condition that causes the premises to be untenantable, and he does not correct the problem after a reasonable time. *Welsch v. Groat*, 897 A.2d 710 (Conn. App. 2006).

--

28

Edward Peruta abused his right of entry to the extent he had any by harassing Cheryl Valadez by repeated visits **(Valadez Affidavit ¶ 47)** and not giving her reasonable notice. Even after being notified by Valadez's attorneys and the police that he and Jeffrey Harris must seek summary process to evict Cheryl Valadez, and the Rocky Hill Police threatened him with arrest if he did not cease his activities, Peruta continued to stop by the condominium with no apparent motive but to harass Valadez. Peruta's continued unannounced entry and invasion of the residence even after he knew that there was a legal controversy as to Valadez's right to remain in the condominium violated the covenant of quiet enjoyment and rendered 29A Carillon Drive untenantable. In addition to trespassing upon Valadez's property right at 29A, Peruta violated Valadez's rights as a tenant and constructively evicted her from the property, doing an end-run around the summary eviction process designed for civil, lawful terminations of property rights.

Because Cheryl Valadez has presented evidence sufficient to raise a triable issue of fact as to her exclusive possessory interest in the condominium and the privilege of Edward Peruta, Lois Peruta, and men under their direction to enter or intrude upon the property, and because there is no dispute of fact as to the Peruta's intent to enter the land and their damage to Cheryl Valadez's possessory rights, the

--

29

Defendants' motion for summary judgment as to the trespass to land claim should be denied.

Even if Cheryl Valadez had no exclusive possessory interest in the condominium, which she did, she still was not a mere licensee, guest or squatter on the land and did not occupy it unlawfully prior to Edward Peruta's interference with her residence there, and therefore any act by Edward Peruta which resulted in the touching or detention of her by police was not privileged for the purposes of the Plaintiff's assault and battery and false imprisonment claims. If the Plaintiff was not a tenant or otherwise an owner of an exclusive possessory interest in the property, she was still a roomer or a lodger-boarder.

Whether a person living in a home is a social guest, who may be asked to leave at any time,  or a "roomer" or "boarder-lodger, who may not be removed without summary process, depends on factors including the length of stay, the existence of a special contract for the residence, whether the person has another abode, and the extent to which the person has made the room her home for the time being. *Allstate Ins. Co. v. Palumbo*, 952 A.2d 1235 (Conn. App. 2008). In this case, the Plaintiff had lived at 29A Carillon Drive for almost all of the ten years prior to her eviction, and two years prior to her eviction without interruption. She had no other home to go to, and had made

--

30

29A Carillon Drive her home for the time being (and for the 10 years prior to her eviction without summary process). She was far more than a guest at the condominium owned by Jeffrey Harris, and was entitled to be free from harassment and coercion by Edward Peruta. Because she was at least a roomer or lodger-boarder at the condominium, she enjoyed the right not to have her rights to occupy the condominium without an unannounced, late night visit by Edward Peruta and the police, demanding that she leave immediately. Even if Valadez did not have an exclusive possessory interest in the condominium, Edward Peruta and the officers he brought with him had no valid law enforcement reason, and therefore no privilege, to demand that Valadez vacate immediately and to subject her to physical force and detention.

### 2.  Trespass to Chattels

Defendants argue that Jeffrey Harris's ownership of the property and Edward Peruta's Power of Attorney "negate[] the exclusivity of Valadez's ownership of any of the tangible items within the Condominium," and therefore the Plaintiff cannot "prove" that the Defendants dispossessed her of, used or intermeddled with her chattels. They also state, without evidence or legal authority, that Harris and Edward Peruta "owned in full, or, at the least, had rights equal to or greater than Valadez to the items." Defendants have put forth this proposition without any legal basis. After careful research of the law,

--

Plaintiff could not find any authority that supports this proposition, and believes that no such authority exists.

Trespass to chattels is defined as the intentional, unprivileged interference with the right to possession of the personal property of another, which results in actual damage to the property of the other. *State v. Sawyer*, 95 Conn. 34 (1920); Lester v. Ladrigan, 90 Conn. 570 (1916). The Plaintiff has submitted evidence showing that Edward Peruta, Lois Peruta, and men accompanying Edward Peruta were at 29A Carillon Drive on the morning of October 31, 2007. That morning, Lois Peruta arrived with several empty garbage bags. **(Hartstein Deposition (Exhibit 4) at p. 48).** Cheryl Valadez had left personal property belonging to her, including jewelry, clothing, medicine and furniture, in the condominium after her confrontation with Edward Peruta the night before. **(Police Incident Report (Exhibit 13) at p. 2).** Sharon Hartstein, a neighbor who lived next door to 29A Carillon Drive, stated in deposition that she witnessed the Peruta's, the accompanying men, and members of the Rocky Hill Police Department enter the condominium. **(Hartstein Deposition at p. 48).** Hartstein stated under oath that she saw the men accompanying the Peruta's take several items she recognized as belonging to Valadez from the condominium and discard them in a nearby dumpster. **(Hartstein Deposition at p. 52)**. After the Peruta's, the police, and all

--

other parties left the condominium, Cheryl Valadez returned that evening. She found personal property belonging to her placed haphazardly in garbage bags, and one of the garbage bags contained a bottle of bleach and some of her clothing, which was destroyed when the bleach leaked from the bottle. **(Valadez Affidavit at ¶ 42 – 44).** Valadez could not find some of her belongings in the bags, including some jewelry and medications. **(Police Incident Report at p. 2).**

Edward Peruta and Lois Peruta state by affidavit, under oath, that they did not personally touch Cheryl Valadez's belongings, and that Valadez was not at the condominium to witness the Peruta's handling her belongings. Based on these two assertions, the Defendants argue that the Plaintiff has not "carr[ied] her burden of proof" that the Defendants touched or damaged any items within the condominium. They also state that Hartstein denied seeing the Peruta's touch anything inside the condominium, which she did not; she stated that she was uncertain whether Ed Peruta or Lois Peruta each specifically touched anything while she was watching, but that the Harris Agricultural employees were definitely loading Valadez's property into bags and into the dumpster. **(Hartstein Deposition at p. 47; Hartstein Affidavit (Exhibit 14) at ¶ 7).**

In a case filed by Edward Peruta against Valadez in the District of Connecticut, her former attorney Edward Noble, and the Rocky Hill Police Department, Edward

--

Noble moved for summary judgment. Noble's Rule 56(a)1 statement of undisputed facts in support of the motion alleged, inter alia, that:

The next day, October 31, 2007, [Edward] Peruta entered the condominium and began to bag Valadez' belongings, in order to remove them and place them in storage. However, he was then informed by the RHPD that they had been advised that he was not lawfully permitted to do that, because Valadez could not be displaced except by a summary process action, and that if he persisted he might be arrested."

**(Peruta v. Rocky Hill Local Rule 56(a)2 Statement (Exhibit 12), ¶ 18)**. Peruta admitted this without exception. **Id.** This admission completed contradicts Peruta's sworn statement in his affidavit that he never touched Valadez's belongings. Edward Peruta has therefore made an affidavit in bad faith to this court in order to delay the resolution of this case or otherwise defraud all involved. The Plaintiff reserves the right to pursue appropriate sanctions, costs and attorney's fees for Edward Peruta's false affidavit as permitted by Rule 56(g) of the Federal Rules of Civil Procedure.

Even if Peruta had not submitted a fraudulent affidavit, summary judgment for the defendants is still inappropriate because the Plaintiff has raised a genuine issue of material fact as to the Perutas' interference with her personal property. The Perutas have admitted that they and/or their associates bagged up Valadez's belongings and

--

34

were going to carry them to a storage unit. Whether the evidence presented by the Plaintiff will satisfy her burden to prove her claim by a preponderance of the evidence is for a jury to decide at trial, and not for the court to determine on a motion for summary judgment.

> **D.** **Defendants Have Not Raised a Genuine Issue of Material Fact Regarding Plaintiff's Claims for Negligence, Recklessness, and Intentional or Negligent Infliction of Emotional Distress and are Entitled to Judgment as a Matter of Law on Those Claims.**

Defendants simply state that "[t]he failure of Plaintiff's claims that the Defendants committed the common law torts of assault and/or battery, false imprisonment and unlawful restraint, and trespassed [sic] as alleged in subsections (c) through (f) of paragraph 43 in Count Five, mandates judgment as a matter of law against Plaintiff's claims of negligence, recklessness, and emotional distress." The Defendants offer no legal authority for this proposition, and Plaintiff believes after careful legal research that no such authority exists. Because the Defendants have not placed any facts into controversy regarding the elements of Plaintiff's emotional distress claims, nor attempted to show that there is no genuine issue of material fact, the court should deny their motion for summary judgment on these issues.

> 1. Intentional Infliction of Emotional Distress

--

35

To prevail on a claim for intentional infliction of emotional distress, a plaintiff must prove that 1) the defendant intended to inflict emotional distress or knew or should have known that emotional distress was a likely result of his conduct; 2) the conduct was extreme and outrageous; 3) the defendant's conduct was the cause of the plaintiff's distress; and 4) the emotional distress sustained by the plaintiff was severe.

The plaintiff has offered sufficient evidence to allow a jury to find that Edward Peruta and Jeffrey Harris acted in such a way that constituted intentional infliction of emotional distress upon the Plaintiff. That Edward Peruta, as an agent for Jeffrey Harris, intended to inflict severe emotional distress, or knew or should have known that his conduct would likely result in emotional distress, is without dispute. Edward Peruta has published a webpage with his version and Jeffrey Harris's version of the events surrounding Cheryl Valadez's eviction. On that webpage, Peruta accuses Valadez of criminal trespass at 29A Carillon Drive, cultivation of marijuana for which Jeffrey Harris was criminally investigated, extortion of Jeffrey Harris. Peruta publishes accusations that Valadez has failed drug tests and cannot keep a job and publicizes medical and dental procedures used to treat Valadez, including a statement that an accident at a dental office involving a needle puncture led to the determination that Valadez suffered from "other medical problems," apparently implying that Valadez is infected with a

--

blood-borne illness. **(Facts on Harris Incidents at pp. 11-12; 29A Carillon Drive page at pp. 1-2, 5, 8)**. It describes her claim to a right to reside at 29A Carillon Drive as an "illegal, unsubstantiated claim of entitlement." **(29A Carillon Drive page at p. 1).**

Peruta's conduct in removing Valadez from the condominium, which was extreme and outrageous in and of itself, further evidences an intent or knowledge that Valadez would suffer emotional distress. In the time leading up to October 30, 2007, Edward Peruta made no attempt to notify Valadez in advance that he intended to take action to exclude her from the condominium. He did not make a good faith request or indicate that he or Jeffrey Harris had the legal authority to compel her to leave the condominium. Instead, Peruta took immediate action to involve Rocky Hill police in the eviction, called Valadez down to the front door so that she would be confronted with him and the police, and made allegations that she was squatting at the condominium. He demanded that Valadez leave the condominium within an hour, giving her no time to collect necessary belongings and find another place to spend the evening. When he arrived at the condominium the next morning with police, he packed the Plaintiff's belonging in a haphazard and unreasonable way as if everything the Plaintiff owned was garbage. After the police told him that his eviction of Valadez was unlawful and that he must cease his actions, Peruta continued to stop at the condominium for no

--

legitimate purpose, knowing that Valadez was residing there. **(Valadez Affidavit at ¶ 47).**

In combination with Peruta's outrageous tirades and defamation on his website, it is clear that Peruta intended not to effect a lawful, orderly eviction of Valadez, but to deliberately harass, abuse, defame, embarrass and humiliate Valadez not only in front of Rocky Hill police and her neighbors, but the broader Rocky Hill community and any other place Valadez might move where people might search the Internet for her name and find Peruta's heinous allegations.

This extreme and outrageous conduct has indeed caused Valadez severe emotional distress. After Peruta appeared at the condominium with police, accused her a squatting, and demanded that she leave immediately, Valadez fled the scene in fear for her safety, spending the cold night in a nearby wooded area rather than risking a return to the condominium where Peruta and the police had forced their way into her residence. After a brief attempt to resume her residence at the condominium and Peruta's continued intrusions on her privacy and feelings of safety, Valadez moved to her daughter's home in Wethersfield before fleeing the state. **(Valadez Affidavit at ¶48-49.** The actions of Edward Peruta aggravated Valadez's general anxiety disorder and post-traumatic stress disorder.

--

Jeffrey Harris also shares responsibility for these actions. Rather than wait until he was out of the hospital to handle his dispute with Valadez over her stay at the condominium himself, he executed a document purporting to be a power of attorney and otherwise authorized and solicited Peruta to act on his behalf to immediately evict Valadez from the condominium. He has further ratified Peruta's behavior by filing a trespass complaint with the Rocky Hill Police Department dated November 5, 2007,  in which he states that he instructed Peruta to tell Valadez to vacate the property and to "assist her" in bagging up her belongings for removal. **(Harris Statement (Exhibit 10)).**

The Defendants have made no attempt to refute this evidence and have not shown that a no genuine issue of material fact exists regarding the Plaintiff's claim for intentional infliction of emotional distress, or that the Defendants are entitled to summary judgment. Therefore, the Defendants' motion for summary judgment on this issue should be denied.

2.    Negligent Infliction of Emotional Distress

The Plaintiff has similarly established a case for negligent infliction of emotional distress. To prevail on a claim for negligent infliction of emotional distress, a plaintiff must show 1) that the defendant's conduct created an unreasonable risk of causing emotional distress; 2) that the distress was foreseeable; 3) that the distress was severe

--

enough that it might result in illness or bodily harm; and 4) that the distress was caused by the defendant's breach of duty. *Carrol v. Allstate Ins. Co.*, 815 A.2d 119 (Conn. 2003); *Witt v. Yale-New Haven Hospital*, 977 A.2d 779 (Conn. Super 2008).

The Defendants' conduct as described above was intentional and designed to deliberately cause the Plaintiff emotional distress. It therefore also created an unreasonable risk of causing foreseeable emotional distress. The distress was severe enough that it might result in illness or bodily harm. At the time of the events in question, the Plaintiff was suffering from hepatitis C and seeking treatment.

As a result of Ed Peruta's conduct at the direction of Jeffrey Harris, there was a foreseeable, unreasonable risk of causing the Plaintiff foreseeable severe emotional distress, and the Plaintiff suffered such emotional distress severe enough to result in illness or bodily harm. Because the Defendants have not shown that no genuine issue of material fact and that they are entitled to a judgment in their favor, their motion for summary judgment as to negligent infliction of emotional distress should be denied.

E.      **Issues of Agency and Vicarious Liability**

The facts recited above deal primarily with Edward Peruta's personal involvement in the torts alleged in this action.  Edward Peruta was the individual whose conduct most consistently and directly violated the Plaintiff's rights. The Plaintiff does not allege

--

40

that Lois Peruta was responsible for the actions of Edward Peruta on the night of October 30, 2007 and therefore concedes that she is not liable for the torts of assault, battery, and false imprisonment. Because she was present at the condominium on the morning of October 31, 2007 with Edward Peruta and participated in the bagging of the Plaintiff's belongings, the Plaintiff maintains that Lois Peruta is personally liable for trespass to land, trespass to chattels, and negligent or intentional infliction of emotional distress to the same extent as Edward Peruta.

It is undisputed that Edward Peruta and his subagents, Lois Peruta and employees of Harris Agricultural Enterprises, Inc. evicted the Plaintiff and dispossessed the Plaintiff of, used and intermeddled with her personal property at the direction of Jeffrey Harris. Because the acts of Edward Peruta and other agent at 29A Carillon Drive on October 29 and 30, 2007 were carried out under the instructions and authority given by Jeffrey Harris as a principal, Jeffrey Harris is liable for all torts complained of by the Plaintiff in Count Five.

## IV.   CONCLUSION

The Plaintiff, Cheryl Valadez, has offered sufficient evidence to raise genuine issues of material fact as to all claims alleged in her complaint, and respectfully requests

--

that this honorable court deny the Defendants' motion for summary judgment on those

claims.

PLAINTIFF,


BY **/s/ A. Paul Spinella**
    **A. Paul Spinella, Esq.**
    **Spinella & Associates**
    **One Lewis Street**
    **Hartford, CT 06103**
    **Telephone:  (860) 728-4900**
    **Fax:  (860) 728-4909**
    **Federal Bar #: ct00078**
    **E-mail:** attorneys@spinella-law.com

**CERTIFICATION**

    I HEREBY CERTIFY that on March 25, 2010, a copy of foregoing **Memorandum of Law in Support of Opposition to Defendants' Motion for Summary Judgment** was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.


/s/ **A . Paul Spinella, Esq**
A. Paul Spinella, Federal Bar #: ct00078


--

42